FILED

2020 Mar-19  PM 03:11
U.S. DISTRICT COURT
N.D. OF ALABAMA



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


UNITED STATES OF AMERICA                    Government

V.                                CASE NO. 2:19-mj-355-JEO

TASHANA LYNN SIMS                           Defendant


**TRANSCRIPT OF PRELIMINARY HEARING**

BEFORE HONORABLE JOHN H. ENGLAND, III
UNITED STATES MAGISTRATE JUDGE

October 3, 2019
Birmingham, Alabama


The proceedings were reported by a stenographic court reporter.
The transcript was produced using computer-aided transcription.


*Margaret Wasmund, RDR, CRR, CRC*
*Federal Official Court Reporter*
*1729 5th Avenue North, Suite 104*
*Birmingham, Alabama 35203*
*margaretwasmund@gmail.com/601-329-6113*

APPEARANCES:

REPRESENTING THE GOVERNMENT:

Austin Shutt, Esquire
U.S. Attorney's Office
1801 4th Avenue North
Birmingham, AL  35203

REPRESENTING THE DEFENDANT:

Michael W. Whisonant, Jr., Esquire
Jaffe, Hanle, Whisonant & Knight, PC
2320 Arlington Avenue South
Birmingham, AL  35205


ALSO PRESENT:

Tashana Lynn Sims, Defendant
Leigh Shepherd, USPO




TABLE OF CONTENTS



WITNESSES FOR THE GOVERNMENT:

MICHAEL ROTHBARD

   Direct Examination By Mr. Shutt:  .......................8

   Cross-Examination By Mr. Whisonant:  ...................14

WITNESSES FOR THE DEFENDANT:

RICKIA SIMS

   Direct Examination By Mr. Whisonant:  ..................21

   Cross-Examination By Mr. Shutt:  .......................24

```
1              (October 3, 2019, 4:10 p.m.)

2              THE COURT:  All right.  Good afternoon.  We're here

3    in United States of America v. Tashana Lynn Sims, Case Number

4    19-mj-355.  We are here for purposes of a detention hearing, as

5    well as a preliminary hearing.  Are the parties prepared to

6    proceed?

7              MR. SHUTT:  The government is ready, Your Honor.

8              MR. WHISONANT:  Defense is ready, Your Honor.

9              THE COURT:  So my understanding, based on the

10   pretrial services report, is that the probation office is

11   recommending detention -- I'm sorry, a bond, and that the

12   government, despite that recommendation, is still insisting

13   upon detention.  So I looked at the pretrial services report.

14   I see very little criminal record.  And I saw where the

15   conditions that the probation office is recommending seemed to

16   be reasonable under the circumstances.

17        So I need to know, first, what is the government's basis

18   for requesting detention?

19             MR. SHUTT:  Your Honor, we believe that Ms. Sims

20   presents a danger to the community.

21             THE COURT:  And what's that based on?

22             MR. SHUTT:  Judge, as laid out in the affidavit for

23   the criminal complaint, Ms. Sims was encountered last year in

24   her home with quantities of cocaine and heroin found, as well

25   as a pill press and assorted items related to the manufacture,
```

1    the alleged manufacture I'll say, of counterfeit drugs, as well

2    as a number of firearms.  Agents executed a search warrant at

3    the same address yesterday and found another pill press and

4    more firearms.

5         Now, the quantities of the controlled substances here give

6    rise to the statutory presumptions because the 841 -- Title 21

7    Section 841 count would carry the potential of a ten-year or

8    more sentence.  So there is a presumption, but also the nature

9    of the instant offense, the fact that it was apparently

10   committed again, and the weapons recovered both last year and

11   this year suggest a potential danger to the community.

12              THE COURT:  Isn't her husband a codefendant?

13              MR. SHUTT:  He is.

14              THE COURT:  He is allegedly charged with the same

15   conduct that she is?

16              MR. SHUTT:  Yes, sir.

17              THE COURT:  All right.  So outside of the presumption

18   and what appears to be two incidents of the same offense, is

19   there anything else that the government contends makes her a

20   danger to the community?

21              MR. SHUTT:  That's the principal contention, Your

22   Honor.

23              THE COURT:  All right.  Is there anything else you

24   wish to present with regard to your position?

25              MR. SHUTT:  I've got an agent here who is prepared to

1   testify as to the underlying facts, as I've kind of summarized

2   here.

3              THE COURT:  Are you going to add anything beyond what

4   you just told me?

5              MR. SHUTT:  Other than -- I don't think so, Your

6   Honor.  And in terms of what's in the -- we'd principally be

7   outlining the materials that are alleged in the complaint, so

8   there are a couple of extra details, like the fact that

9   Ms. Sims was encountered with a firearm, had to be addressed by

10  officers -- armed officers in last year's search warrant, some

11  minor details like that.  But no, the principal contentions are

12  there, along with what I've just added by way of proffer in

13  terms of what was recovered yesterday in the same search

14  warrant.

15             THE COURT:  Well, I'm perfectly fine with allowing

16  you to proceed by proffer with regard to that particular

17  information.  And it doesn't sound like calling a witness is

18  going to add anything beyond what you just told me, unless

19  there are other facts that the court is unaware of.

20             MR. SHUTT:  No, Your Honor.  We're obviously prepared

21  to meet our burden today of showing probable cause.  What I

22  would add as it respects the bond issue, and again, what's not

23  alleged in the complaint, which is largely based on the events

24  of last year, is, again, that there were multiple firearms in

25  the house.  Ms. Sims was encountered in the house, along with

1    her husband, Mr. Coleman, and again, another pill press and

2    assorted materials.  The only issue, or one of the issues, I

3    guess, as it concerns the recommended --

4              THE COURT:  Residence?

5              MR. SHUTT:  -- terms of the bond is, Judge, where is

6    she going to go?

7              THE COURT:  Well, I'm not going to let her go home if

8    I let her go.

9              MR. SHUTT:  Okay.  Well, that's --

10             THE COURT:  Does that change the government's

11   position, or are you still insisting upon detention?

12             MR. SHUTT:  Judge, I come in here before having a

13   chance to hear from any third-party custodians and get an idea

14   of where Ms. Sims might live.  I think -- we may come to a

15   position of having -- hearing on those two issues that we could

16   be satisfied with the recommendation.

17             THE COURT:  Why don't we do this, because there is

18   ample information in the pretrial services report.  Counsel,

19   Mr. Whisonant, would you be inclined to insist upon a

20   preliminary hearing if the parties can agree with regard to a

21   bond?

22             MR. WHISONANT:  Let me briefly talk to Ms. Sims.

23             THE COURT:  All right.

24        (Off-the-record discussion between Mr. Whisonant and

25   Defendant Sims.)

1          MR. WHISONANT:  Your Honor, I think that, first of

2  all, Ms. Sims would like to go back to her residence.  I

3  understand the court's hesitation.

4          THE COURT:  That's not going to happen.

5          MR. WHISONANT:  Okay.  With that said, if there's an

6  agreement that can be reached on bond, I still think that we

7  may need to just hear the full evidence in this case, Your

8  Honor.

9          THE COURT:  All right.  Mr. Shutt, call your witness.

10         MR. SHUTT:  I call Special Agent Michael Rothbard.

11         MR. WHISONANT:  Just for clarity, this is -- is this

12  the evidence for the preliminary hearing?

13         THE COURT:  For both.

14               **MICHAEL ROTHBARD**

15  was thereupon called as a witness and, having first been

16  duly sworn, testified as follows:

17         THE COURTROOM DEPUTY:  Please state your name for the

18  record.

19         THE WITNESS:  Michael Rothbard.

20         THE COURTROOM DEPUTY:  Could you spell your first and

21  last name.

22         THE WITNESS:  Michael, M-I-C-H-A-E-L, Rothbard,

23  R-O-T-H-B-A-R-D.

24         THE COURTROOM DEPUTY:  Thank you.

25         MR. SHUTT:  May I proceed, Your Honor?

1          THE COURT:  Yes.

2                    **DIRECT EXAMINATION**

3   BY MR. SHUTT:

4   Q.  Agent Rothbard, by way of introduction, could you tell His

5   Honor where you work and what it is you do for a living?

6   A.  I work for the United States Food and Drug Administration,

7   Office of Criminal Investigations, as a special agent.

8   Q.  Prior to your time at FDA, did you serve in any other law

9   enforcement capacity?

10  A.  Yes.  I served as a special agent for the United States

11  Secret Service for a little over 12 years.

12  Q.  How long have you been assigned here in Birmingham with

13  FDA?

14  A.  Just a year a couple days ago.

15  Q.  Have you become familiar with some of the facts underlying

16  an investigation with respect to this defendant, Tashana Sims?

17  A.  Yes.

18  Q.  And how have you become familiar with Ms. Sims and this

19  investigation?

20  A.  When I moved here a year ago, I inherited a case that was

21  already opened on -- against Earnest Coleman for purchasing and

22  manufacturing pills using a pill press machine.

23  Q.  And did that investigation start before your time here in

24  northern Alabama?

25  A.  It did.

ROTHBARD - DIRECT

1    Q.   Would it be fair to say, then, that you've learned some of

2    the facts about this investigation from reading reports and

3    speaking with other officers?

4    A.   That's correct.

5    Q.   Could you summarize for His Honor some of what you know

6    about what started the investigation into Mr. Coleman and

7    ultimately Ms. Sims?

8    A.   Yes.  So on or about April 5th, 2018, Customs and Border

9    Protection International Mail Facility intercepted a parcel

10   that was addressed to Earnest Coleman going to Mr. Coleman's

11   address and Ms. Sims's address at 3300 Berkeley Avenue in

12   Bessemer, Alabama.  Inside that parcel contained two dies which

13   are used for a pill press machine to make counterfeit pills.

14   They did -- Custom and Border Protection did an open source

15   Internet on that particular pill, and it came back it would be

16   used for oxycodone hydrochloride.

17          That information was delivered over to Homeland Security

18   Investigations here in Birmingham.  With the assistance of

19   Alabama Law Enforcement Agency, they conducted a controlled

20   delivery to Mr. Coleman at the Bessemer address, and on or

21   about April 12th, 2018, the state conducted a search warrant

22   where a pill press machine was found in the laundry room, along

23   with numerous counterfeit pills and numerous counterfeit dies

24   that are used for the pill press machine.

25          THE COURT:  And when was this?

1          THE WITNESS:  This was on or about April 12th of

2   2018, in the state search warrant.  Also found in the residence

3   at that time was heroin and cocaine was found in the kitchen

4   cabinet.  And nine firearms, along with body armor, was seized

5   from the residence.

6   BY MR. SHUTT:

7   Q.  And then was Ms. Sims also encountered at that time in

8   April 2018, during the search warrant?

9   A.  According to speaking to the agents of Homeland Security

10  Investigations and Alabama law enforcement agencies and reading

11  reports, once the police did a knock and announce to execute

12  the state search warrant, Ms. Sims was found in the living room

13  holding a Glock 22 in her hand, and the officers came very

14  close to shooting her and actually had to diffuse the situation

15  of getting her to drop the firearm.

16  Q.  You mentioned a pill press machine, dies and so forth that

17  were recovered.  Are those consistent with the production and

18  holding for sale of counterfeit drugs?

19  A.  They are.

20  Q.  And you lay out in your affidavit underlying the criminal

21  complaint some of the sections under Title 21 that criminalize

22  that conduct.  Is that fair to say?

23  A.  Yes.

24  Q.  Okay.  Mr. Coleman was interviewed at that time back in

25  April of last year; is that right?

1    A.   Yes.   Mr. Coleman waived his *Miranda* warning, was

2    interviewed and basically stated to the agents that he

3    purchased the pill press machine approximately one year ago

4    from that date of that interview from a Chinese website.  He

5    paid $400.  It took him several months to learn how to use the

6    machine to get proficient in making the pills, and

7    approximately eight months prior to that date of that search

8    warrant is when he started to sell the counterfeit pills on the

9    street.

10    Q.   And did that indicate to you and other officers that that

11    press had been at that residence for some time before the

12    warrant?

13    A.   It did.

14    Q.   Now, fast forward to this week.  Were there some arrests

15    and another search made at that very same residence?

16    A.   There was.  And some of that was based off of information

17    that I submitted to our forensic chemistry center on items that

18    were seized from the initial state search warrant, specifically

19    Actavis counterfeit pills that were found at their residence.

20    And according to our forensic chemistry center, those pills

21    that are supposed to be oxycodone and hydrochloride were not

22    made with oxycodone and hydrochloride.  In fact, contained

23    acetaminophen, fentanyl, heroin, and papaverine.

24    Q.   And to be clear, we're talking about some of these pills

25    that were recovered -- counterfeit pills that were recovered

ROTHBARD - DIRECT

1    back in April of last year?

2    A.  Correct.

3    Q.  You'd also mentioned that there was some cocaine and

4    heroin recovered from the kitchen cabinet at that time?

5    A.  Yes.

6    Q.  And did lab reports confirm the identities of those

7    substances?

8    A.  Yes, they did.

9            THE COURT:  Let me stop you.  So you executed another

10   search warrant last week?

11           THE WITNESS:  Yesterday, sir.

12           THE COURT:  At the same residence?

13           THE WITNESS:  Same residence.

14           THE COURT:  Okay.  And you found what?

15           THE WITNESS:  That search warrant we found another

16   pill press in the laundry room, exactly where the last pill

17   press was, and Your Honor, this is a small house.  You would

18   have to step over the pill press to get into the laundry room.

19   The pill press was there.  We found two more additional

20   firearms in their master bedroom where they sleep, and the two

21   firearms were located on both sides of the bed.  One was on the

22   chair on the left side.  The other one was on the nightstand on

23   the right side.

24       We also found additional counterfeit pills.  In the pill

25   press, there was another pill that was just lying right there

1    that we removed that matched the imprint T194 that was in the

2    press, which is, again, a counterfeit hydrocodone pill.  The

3    two firearms were found.  And in the family room next to the

4    left side of the couch was another international parcel that

5    contained unknown powder.  There was a large bag of white

6    powder and then, forgive me, Your Honor, I don't know exactly

7    how many other small bags, but all different colors of pills

8    that in our experience are used as like a binding agent and

9    coloring for manufacturing the pills.

10        Also, in the kitchen, a very small kitchen, there was a

11   small table that had a sifter, you know how you sift the

12   contents, and another cup that had white powder all over it in

13   the garbage can right next to that table, had, on a Mountain

14   Dew bottle, a large amount of white powder that looked like it

15   was just dumped in there that we seized.  And also, sitting on

16   top of the garbage can, was a very large -- looked like a

17   plastic bowl that contained a lot of powder that, in my

18   experience, looked like someone was mixing items in it, and

19   those items were seized.

20        We also found a loaded handgun magazine containing

21   27 rounds in the -- what I consider a dining room next to the

22   computer stand that was fully loaded.  Both the weapons were

23   fully loaded with one in the chamber.

24   BY MR. SHUTT:

25   Q.  With respect to the powders you just described found in

1     the kitchen area, could you describe for the judge, are those

2     items things that you had been able to see just standing in the

3     kitchen, or were they hidden in some capacity?

4     A.  Clear sight.  As soon as you walked into the front door

5     and moved towards the back of the kitchen, the table was right

6     in front of you.  The items were in clear view right on top of

7     the table and right on top of the garbage can.

8     Q.  And who, if anybody, did you and other officers encounter

9     yesterday on execution of the warrant?

10    A.  Two individuals inside the residence, Ms. Sims and

11    Mr. Coleman.

12    Q.  The same two people that were there in April of 2018?

13    A.  Correct.

14    Q.  And do you know that -- or have you discovered that this

15    address, this 3300 Berkeley Avenue in Bessemer, was the address

16    or is the address listed on Ms. Sims' current driver's license?

17    A.  It is.

18              MR. SHUTT:  Pass the witness, Your Honor.

19              THE COURT:  Mr. Whisonant.

20              MR. WHISONANT:  Yes, Your Honor.

21                        **CROSS-EXAMINATION**

22    BY MR. WHISONANT:

23    Q.  Mr. Rothbard, you said that there was a package that was

24    found in California; is that correct?

25    A.  Are you talking about the first package --

ROTHBARD - CROSS

1    Q.  I am.

2    A.  -- that initiated this investigation?

3    Q.  I am.

4    A.  Yes.

5    Q.  And whose name was on that package, Mr. Rothbard?

6    A.  Earnest Coleman.

7    Q.  And the package, did Customs and Border Patrol, did they

8    allow that package to be delivered?

9    A.  That initial package, back in April 2018, was sent to

10   Homeland Security Investigations.  And with the assistance of

11   the Alabama Law Enforcement Agency, they did a controlled

12   delivery.

13   Q.  Okay.  And the controlled delivery happened when, Officer?

14   A.  On or about April 12th, 2018.

15   Q.  Okay.  That was the same time that the search warrant was

16   issued for the same residence?

17   A.  Yes.

18   Q.  And the search warrant that was for that particular time

19   was based solely on the pill press you call it?

20   A.  Well, it was based on the die that was found in the

21   parcel.

22   Q.  Okay.  I'm sorry.  It was a die, not a pill press; is that

23   correct?

24   A.  Correct.  It was a die which is used to make the pills.

25   It attaches into the pill press.

1    Q.  Okay.  Getting to that day in April of last year,

2    approximately 18 months ago, you said certain drugs were found.

3    I heard that there was some found in the cabinet.  Where else

4    were the drugs found?

5    A.  I don't know exactly where.  I would have to look through

6    the paperwork.  I was not present during that first initial

7    search warrant.

8    Q.  Okay.  So for the charges that we have today, you're not

9    aware of where the drugs were found in the household; is that

10   correct?

11   A.  I'm aware that the cocaine and heroin was found in the

12   kitchen cabinet.

13   Q.  Okay.  Do you know how long the drugs were there?

14   A.  I do not.

15   Q.  Do you know how long Ms. Sims was there prior to the

16   execution of the search warrant?

17   A.  I do not.

18   Q.  Do you know what time the search warrant was executed?

19   A.  I do not.

20   Q.  Getting to the issue of a firearm, you're not aware that

21   Ms. Sims has any felony convictions, are you?

22   A.  I'm not aware.

23   Q.  And are you aware that she has a pistol permit to carry a

24   firearm?

25   A.  I'm not aware.

ROTHBARD - CROSS

1  Q.  Do you know what clothes the officers were wearing when

2  they went into her home that day?

3  A.  I'm not aware.

4  Q.  Are you aware of whether or not they knocked and

5  announced, Officer?

6  A.  I'm not aware.  I would --

7  Q.  Well, stop --

8  A.  -- be guessing.

9  Q.  Do you know where her home is?

10  A.  I do.

11  Q.  Would you describe that as a particular safe area, or is

12  that known as a high crime area?

13  A.  I would not know, based on just living here for a year.

14  Q.  Okay.  You said that Mr. Coleman made a statement.

15  A.  He did.

16  Q.  And in his statement, he admitted to ordering the press;

17  correct?  Or the die cast.  I'm sorry.  Is that correct?

18  A.  Your first -- the pill press.  In his interview, he stated

19  he purchased the pill press from a Chinese website, paid $400.

20  Q.  Okay.  And he admitted to making pills; is that accurate?

21  A.  Correct.

22  Q.  He admitted to selling the pills?

23  A.  Correct.

24  Q.  What, if anything, did he mention about Ms. Sims,

25  Mr. Rothbard?

1    A.  Nothing that I'm aware of.

2    Q.  Okay.  So he did not implicate her in any of his illicit

3    conduct; is that correct?

4    A.  Nothing that I'm aware of.

5    Q.  Okay.  And the search warrant that was executed yesterday,

6    Your Honor, or excuse me, Mr. Rothbard, that was based on

7    information that you gained from the initial search warrant; is

8    that correct?

9    A.  From the initial search warrant, and also, there was a

10   second or another international package that was seized from

11   Customs Border Protection.

12   Q.  Okay.  When was that package seized?

13   A.  That was seized, if I can refer to my affidavit....

14   Q.  Sure.

15   A.  The information I received on September 15th, 2019,

16   Homeland Security Investigations passed information to me.

17   They were informed by Customs Border Protection International

18   Mail Facility in California that another parcel that was

19   addressed to Earnest Coleman going to the same address

20   contained another die for a pill press machine.

21   Q.  Okay.  Are there any other witnesses that know anything

22   about the contents that were found in the home, meaning are

23   there any unindicted co-conspirators in this case?

24   A.  Not that I'm aware of.

25   Q.  Outside of law enforcement, no one made a complaint about

ROTHBARD - CROSS

1    drug trafficking in that home or selling drugs in that home; is

2    that accurate?

3    A.  Not that I'm aware of.

4    Q.  We don't have anyone that's going to say that Ms. Sims

5    sold them drugs; is that correct?

6    A.  Not that I'm aware of.

7    Q.  That she made drugs?

8    A.  Not that I'm aware of.

9    Q.  That she -- there's no record from Customs and Border

10   Patrol about that she ordered any of these packages for any of

11   the drugs or the die cast or the pill press; is that correct?

12   A.  Not that I'm aware of.

13             MR. WHISONANT:  I have nothing further at this time,

14   Your Honor.

15             THE COURT:  Mr. Shutt, do you have any questions?

16             MR. SHUTT:  No, sir.

17             THE COURT:  I have a few.  So outside of her being

18   present twice at a house with a pill press and drugs and

19   firearms, what is it that points to Ms. Sims's involvement in

20   the charges that are currently pending?

21             THE WITNESS:  Her --

22             MR. SHUTT:  I didn't know if that question was for

23   me, Judge.

24             THE COURT:  No.  It's for him.

25             THE WITNESS:  So based on our training and

1    experience, being that she's in the residence, a very small

2    residence, she has to have knowledge.  She has knowledge that

3    her husband is manufacturing in these counterfeit pills.

4             THE COURT:  She's supposed to tell on him?

5             THE WITNESS:  Just the items in plain sight.  As I

6    said before, Your Honor, the pill press is in the laundry room.

7    In order to get from the kitchen to the laundry room, you would

8    have to physically step over the pill press.  The tables in the

9    kitchen had all items that I believed were used to manufacture

10   these pills.  Other items found in the family room suggest that

11   she is aware that these items and possibly -- I mean, there's

12   no information that we have that she participated or assisted

13   him, but with the items here from the first time and last time,

14   she's well aware, knowing what's going on and....

15            THE COURT:  Okay.  I don't have any questions.  Do

16   you have any follow-up, either side?

17            MR. SHUTT:  No, sir.

18            THE COURT:  All right.  You can step down, sir.

19            THE WITNESS:  Thank you, sir.

20            THE COURT:  All right.  Mr. Shutt, I know that was

21   sort of in addition to what you said originally or proffered.

22   That was the additional information that you put forth with

23   regard to probable cause, as well as the detention portion of

24   this.

25        So Mr. Whisonant, I'll turn to you to add any additional

1    evidence you want to add at this point.

2            MR. WHISONANT:  As to the probable cause or to the

3    bond issue?  Address the bond?

4            THE COURT:  Either one.  It's up to you.  If you're

5    going to argue, you can save that until the end.

6            MR. WHISONANT:  Okay.

7            THE COURT:  But if you want to present something with

8    regard to possible conditions or --

9            MR. WHISONANT:  Yes, Judge.

10           THE COURT:  -- the third-party custodian.

11           MR. WHISONANT:  As to third-party custodian, I would

12   like to call Ms. Rickia Sims to the stand.  This is the

13   client's mother, Your Honor.

14                         **RICKIA SIMS**

15   was thereupon called as a witness and, having first been

16   duly sworn, testified as follows:

17           THE COURTROOM DEPUTY:  State your name for the

18   record.

19           THE WITNESS:  My name is Rickia Sims, R-I-C-K-I-A,

20   last name Sims, S-I-M-S.

21           THE COURTROOM DEPUTY:  Thank you.

22                     **DIRECT EXAMINATION**

23   BY MR. WHISONANT:

24   Q.  Ms. Sims, how do you know Tashana Sims?

25   A.  This is my biological daughter.

1    Q.   How old are you, Ms. Sims?

2    A.   I'm 61 years old.

3    Q.   And do you live here in the Birmingham area?

4    A.   Yes, I do.

5    Q.   Do you know Ms. Sims to live in the Birmingham area?

6    A.   Yes.

7    Q.   And how long has your daughter lived in the Birmingham,

8    Jefferson County area?

9    A.   Well, she was born in New York City, November 25th at

10   1982, and we moved back home when she was five years old.

11   Q.   So she's been here since she was five years old?

12   A.   Yes, sir.

13   Q.   So she's been here for over 30 years?

14   A.   All of her life.  Uh-huh.

15   Q.   So she has significant friends and family members and ties

16   to this community; is that fair?

17   A.   Yes, sir.

18   Q.   And as far as her physical condition, do you know she's in

19   good physical health?

20   A.   Well, she had a little light stroke back in 2009, and as

21   far as I know, other health condition is good, okay.  She's a

22   hard worker.

23   Q.   Okay.  She's a worker.  So she works here in town?

24   A.   Yes, sir.

25   Q.   So she's a productive citizen, would you say?

1    A.  All the time.  Two jobs.

2    Q.  And you don't know anything about the charges here in this

3    case?

4    A.  No, sir.  No.

5    Q.  I just wanted to make that clear.  And as far as -- if

6    she's ever had to go to court before, do you know that she's --

7    or do you believe that she's gone?

8    A.  Oh, I bring her.

9    Q.  Okay.  We'll get to that.  So if the court were to release

10   her on a condition that would require her to stay at your home,

11   would you allow that?

12   A.  Yes, sir.

13   Q.  If the court would like you to make sure that she comes to

14   court or do your best to try to make sure she comes to court

15   and makes the court appearances, would you do your best to make

16   sure that happens?

17   A.  Yes, I will.

18   Q.  And you don't believe in any way that your daughter is

19   going to be a danger to anyone in your home or otherwise;

20   right?

21   A.  No, sir.  No.

22          MR. WHISONANT:  I don't think I have anything further

23   of this witness, Your Honor.

24          THE COURT:  Mr. Shutt.

25          MR. SHUTT:  Thank you, Judge.

1      **CROSS-EXAMINATION**

2    BY MR. SHUTT:

3    Q.  Good afternoon, ma'am.

4    A.  Hi.

5    Q.  How are you?

6    A.  I'm fine.  How are you today?

7    Q.  I'm well.  Thank you.  Ma'am, do currently work now?

8    A.  No.  I'm disabled.  I'm battling with cancer.

9    Q.  I'm sorry to hear that.

10   A.  Uh-huh.

11   Q.  Do you spend -- would it be fair to say you spend most of

12   your time at your home then?

13   A.  Yes.  Between the hospital and home.

14   Q.  Sure.  Of course, you're being offered by your daughter

15   and her attorney as a third-party custodian?

16   A.  Uh-huh.

17   Q.  For her bond.  Has anyone explained to you the role of a

18   third-party custodian, what you would be asked to do?

19   A.  Well, no, sir.  I never been through court like this.

20   Q.  Okay.  If I told you that essentially, you would be Judge

21   England's kind of eyes and ears watching out for your daughter,

22   and that it would be your responsibility, if you're made a

23   third-party custodian, to inform the court or probation officer

24   if your daughter didn't follow the conditions that the court

25   would set for her bond, is that in keeping with your

1   understanding of what you're being asked to do?

2   A.  Yes.  I would be willing to do that.

3   Q.  Okay.  And aside from you said you've got to go to the

4   doctor, obviously --

5   A.  Uh-huh.

6   Q.  -- I assume you go to perhaps church, go to the grocery

7   store --

8   A.  All the time.

9   Q.  -- that sort of thing?

10  A.  Uh-huh.

11  Q.  Are you home other than those errands?

12  A.  Yes.  And I have a son that live with me, have to live

13  with me, a special son.

14  Q.  Okay.

15  A.  Uh-huh.

16  Q.  Who else lives in your home?

17  A.  Just he and I, and my other son is -- I have five

18  children.  She's my second daughter.

19  Q.  Okay.  So do I understand right you've already got two

20  sons living in your home?

21  A.  Uh-huh.

22  Q.  Would you still have room for your daughter?

23  A.  Uh-huh.  I have bedrooms.

24  Q.  You mentioned earlier that you would help ensure that she

25  gets to court?

1   A.  Yes.

2   Q.  Do you drive, ma'am?

3   A.  Yes, I drive.

4   Q.  Okay.  And you mentioned that your daughter works.  If I

5   heard you right, you said she had two jobs?

6   A.  Yes.

7   Q.  What are those?

8   A.  She's a caregiver.  She works with the elderly.  And she

9   also works at beauty supply school, the wigs and stuff.

10  Q.  Okay.  Do you know how long she's been doing that?

11  A.  Awhile.  She love it.  She's been doing it mostly all her

12  life.

13  Q.  All her life?

14  A.  Uh-huh.

15  Q.  Is that the B & B Beauty Shop?

16  A.  Yes.

17  Q.  Does that sound right?

18  A.  Yes, sir.

19  Q.  And could you give me an idea of where you live?  I don't

20  need the exact street address, but what part of town do you

21  live in?

22  A.  I live in the West End area.

23  Q.  West End?

24  A.  Near Ensley and West End.

25  Q.  Okay.  Now, where do you understand your daughter to live?

SIMS - CROSS

1    A.  She lives in the Bessemer area.

2    Q.  Bessemer.  That 3300 Berkeley Avenue?

3    A.  Yes.

4    Q.  That's her house?

5    A.  Uh-huh.

6    Q.  How far is your house to hers?

7    A.  Maybe about a 20 -- 20-minute ride.

8    Q.  Okay.  Do you get over to see her much at her house?

9    A.  Every now and then, like after church, we go and pray

10   together.

11   Q.  Okay.  How often would you say that you've seen her at her

12   house in Bessemer?

13   A.  Maybe, like, two.  Maybe three times out of a month.

14   Q.  Two or three times a month?

15   A.  Uh-huh.

16   Q.  How long have you known her to live over there in

17   Bessemer?

18   A.  About eight, nine years, I think.

19   Q.  Eight or nine years.  All at that same address?

20   A.  No, it was a different address.

21   Q.  Okay.  Do you know how long she had lived at that Berkeley

22   Avenue address?

23   A.  At Berkeley, oh, wow, she was living in apartments first,

24   and then she lived in Berkeley.  I guess I'd say between six or

25   seven years.

SIMS - CROSS

1  Q.  Six or seven years?

2  A.  Uh-huh.

3  Q.  Ma'am, are there any firearms in your house now?

4  A.  No.

5  Q.  Any drugs?

6  A.  No.

7  Q.  And you understand that if your daughter was permitted to

8  live at your house on bond, that probation officers might come

9  to your house to check for things along that line?

10  A.  Anytime, they're welcome.

11  Q.  All right.

12          MR. SHUTT:  Thank you, ma'am.

13          THE WITNESS:  You're welcome.

14          THE COURT:  Any follow-up?

15          MR. WHISONANT:  Nothing further.

16          THE COURT:  Thank you, ma'am.

17          THE WITNESS:  All right.  You're welcome.

18          THE COURT:  Any additional evidence, Mr. Whisonant?

19          MR. WHISONANT:  No, Your Honor.

20          THE COURT:  All right.  I'm prepared for argument.

21          MR. SHUTT:  Judge, I'd pretty much stand on what I

22  offered before.  It sounds like Ms. Sims has been at this

23  residence for a little while, and even though it was inquired

24  into earlier, she may not be a prohibited person.  She may have

25  a permit, but the possession of a firearm in furtherance of a

1   drug activity such as this would be illegal either way.  So I

2   don't --

3           THE COURT:  Is she charged with that?

4           MR. SHUTT:  She is not.  We didn't put that in our

5   affidavit or -- excuse me, in our complaint, but the indictment

6   would be forthcoming, so we'll have to see what that's about,

7   Judge.

8           THE COURT:  So with regard to probable cause, you

9   heard the question that I asked the agent and his response to

10  that question.

11          MR. SHUTT:  Yes, Your Honor.

12          THE COURT:  Explain to me why I should conclude at

13  this juncture there's probable cause that she was involved in

14  the three things that you have charged in this complaint.

15          MR. SHUTT:  Sure.  Well, we have cocaine, heroin,

16  fentanyl --

17          THE COURT:  Other than the fact that it's her house

18  and his house and she was there.

19          MR. SHUTT:  Okay.  And that these items, many of them

20  were in plain view when the officers executed two warrants over

21  the course of two years.  Nine firearms and body armor, which

22  the court knows all too well that guns are tools of the drug

23  trade.  Judge, the fact that she lives there, that these items

24  are there and continue to be there in such quantities, I think

25  we'd be able to make out a probable cause showing that she had

1    knowing -- if not sole possession, joint possession over these

2    items.

3            THE COURT:  And as far as detention is concerned,

4    you're alleging that she is dangerous, not that she's a risk of

5    flight but that she's dangerous?

6            MR. SHUTT:  She's got long-standing ties to this

7    community, Your Honor.  Again, and I think the court knows

8    where I'm coming from, coming here before hearing from

9    Ms. Sims, the mother, I couldn't have known that there would be

10    a suitable place for her to live.  Ms. Sims seems like a

11    suitable third-party custodian, as far as that goes.  Her

12    residence is some distance away from the sight of these crimes.

13    So the presumption being what it was, there may be conditions

14    that the court can find satisfy the defense burden on that

15    issue.

16            THE COURT:  All right, Mr. Whisonant.

17            MR. WHISONANT:  Yes, Your Honor.  Your Honor, the

18    government went to great lengths to establish that Ms. Sims was

19    present at the home where there was potential unlawful drug

20    activity occurring.  However, they failed to establish a nexus

21    between that criminal activity, which they are required to do

22    under *United States v. Rackley*, 742 F.2d 1266, page 1271

23    through 72, Your Honor.

24       In addition to that, they also failed to prove that guilt

25    cannot be assumed solely through familial relationships or

1   close associations, Your Honor.  That's found at *United States*
2   *v. Reyes*, 595 F.2d 275 and 280.  Your Honor, there isn't
3   probable cause because mere proximity is not enough to
4   establish that she committed the offense.
5       There isn't -- and for that reason, we would ask that you
6   dismiss this case for lack of probable cause, Your Honor.
7           THE COURT:  All right.  I'm prepared to make my
8   ruling.  As far as the probable cause determination is
9   concerned, you all have scant evidence with regard to her
10  involvement, but there is enough evidence at this juncture to
11  at least let it go forward.
12      And so I find, based on the amount of drugs on two
13  different occasions, her proximity to possession of firearms,
14  that at least at this juncture there is probable cause to
15  support the charges in the complaint.
16      With regard to detention, I believe that the defendant has
17  met the burden to rebut the presumption, and so I'm prepared to
18  release the defendant on a bond with the conditions recommended
19  by the probation office.  Is there some other condition that
20  the government wishes to impose that is not included in the
21  probation office's recommendation?
22          MR. SHUTT:  May I have just a moment to review these
23  again, Your Honor?  The second condition recommended here is to
24  refrain from the use or unlawful possession of drugs.  I would
25  assume that would include standard drug testing, Your Honor.

```
 1    If that's the case, Your Honor, I would have nothing else to
 2    request.
 3              THE COURT:  All right.  We'll need a few minutes to
 4    get the bond together.  All right.  Ms. Sims.  As I said, I'm
 5    going to deny the government's motion to keep you in custody
 6    and release you on a bond.  You should have a copy of that bond
 7    there in front of you, and so I'm about to go through that bond
 8    and your conditions of bond.
 9        And so I want you to listen as I go through those
10    conditions, and if you have any questions when I get to the
11    end, then you need to ask those questions.  Do you understand?
12              THE DEFENDANT:  Yes, Your Honor.
13              THE COURT:  All right.  Now, I'm releasing you on a
14    $5,000 unsecured.
15              THE COURTROOM DEPUTY:  Ms. Sims.  Ms. Sims.
16              THE COURT:  So Ms. Sims, I'd also ask you to sit at
17    the table with your daughter.
18              MRS. SIMS:  Yes.  Thank you.
19              THE COURT:  Because as the third-party custodian,
20    you're going to have to make sure she adheres to these
21    conditions.  If she doesn't, then it's your obligation to
22    report that to the court.  So just like your daughter, I want
23    you to listen to these conditions as I go through them.  And if
24    you have any questions, then you need to ask that as well.
25              MRS. SIMS:  Yes, sir.
```

1          THE COURT:  As I said, Ms. Sims, I'm going to release

2     you on a $5,000 unsecured bond, which means that you don't have

3     to put forth any money, and it's good with your signature.

4     However, should you fail to show up as required, then you could

5     owe the sum of $5,000 to the government.  Do you understand?

6          MRS. SIMS:  Yes.

7          THE DEFENDANT:  Yes.

8          THE COURT:  With regard to your conditions, if you'll

9     scroll down or turn to page 2.  The first condition requires

10    you not to commit any offense in violation of federal, state,

11    or local law while on release.  You're to maintain the

12    residence at your mother's address and advise your supervising

13    officer if you make any changes in address or telephone number.

14         I did notice on the pretrial services report that you

15    refused to provide a telephone number.  We are going to have to

16    have a telephone number to get in contact with you with.  So

17    it's either got to be one you give or one that your mother

18    gives, but we need to have a telephone number to get in contact

19    with you.

20         You're also to appear at all proceedings as required, and

21    if convicted, surrender for any service of sentence the court

22    may impose.  If you fail to do that, then you could be charged

23    with bail jumping, which could carry additional time in

24    addition to whatever time you might receive in this case.  Do

25    you understand?

1          THE DEFENDANT:  Yes.

2          THE COURT:  You're also to report to your supervising

3    officer as instructed.  Condition 5 requires that you not

4    contact, harass, intimidate, or threaten any person in

5    violation of law.  That means any prosecutors, witnesses or

6    anyone associated with this case.  Do you understand?

7          THE DEFENDANT:  Yes, I do.

8          MRS. SIMS:  Yes.

9          THE COURT:  If you should engage in any of that

10   conduct, then you could be charged with obstruction of justice,

11   which could carry additional time in addition to whatever time

12   you might receive in this case.  Do you understand?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  All right.  Condition 6 requires that you

15   report to your supervising officer every contact with law

16   enforcement personnel, including arrest, questioning, or

17   traffic stops.  I'm placing you in the third-party custody of

18   your mother at the address indicated on the bond.

19       Condition 14 requires that you not -- that you refrain

20   from possessing, either personally or in an automobile, at your

21   home or your mother's home, any rifle, pistol, shotgun, or

22   other firearm or destructive device, weapon, or ammunition.

23   And the United States Marshals Service has the court's

24   permission, as well as the probation office, to search your

25   person, car, or home at any time for weapons and/or ammunition.

1    16 requires that you refrain from possessing or being

2   around any illegal narcotic or controlled substances or

3   paraphernalia associated with such substances, and you can take

4   any lawfully prescribed medication.  You're also to submit to

5   drug testing and drug treatment as directed by your probation

6   office.

7    Those are all the conditions that I understand are

8   applicable to the bond.  Do you agree, Mr. Shutt?

9    MR. SHUTT:  Yes, Your Honor.

10    THE COURT:  Same question to you, Mr. Whisonant.

11    MR. WHISONANT:  Yes, Your Honor, I do agree.

12    THE COURT:  And Ms. Sims, I'm starting with your

13   daughter.  Do you have any questions about the conditions I'm

14   imposing?

15    THE DEFENDANT:  No, sir.

16    THE COURT:  And Ms. Sims?

17    MS. SIMS:  No, sir.

18    THE COURT:  All right.  Let me get you both to sign

19   the bond where indicated.

20    All right, Ms. Sims, that concludes this portion of this

21   hearing.  Once you are processed by the marshals service, you

22   will be free to go, to return on your next court date.  Is

23   there anything else we need to take up at this time?

24    MR. SHUTT:  Not from the government, Your Honor.

25    MR. WHISONANT:  Not from the defense, Your Honor.

1                    THE COURT:  If there's nothing else, then we're

2      adjourned.

3                    MRS. SIMS:  Thank you, Your Honor.

4           (Proceedings concluded at 5:00 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER


I, Margaret Wasmund, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the Northern District of Alabama, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the court and the Judicial Conference of the United States.

Dated this 19th day of March 2020.




_Margaret Wasmund_
MARGARET WASMUND, RDR, CRR, CRC
OFFICIAL COURT REPORTER